**In re FRIED et al.**

No. 168, Docket 20466.

Circuit Court of Appeals, Second Circuit.
Feb. 25, 1947.
Writ of Certiorari Granted June 23, 1947.
See 67 S.Ct. 1755.

AUGUSTUS N. HAND and FRANK, Circuit Judges, dissenting in part.

———————

"The respondents justify the search and In his opinion the judge said in part:

seizure on several grounds. They will be treated seriatim. (1) The search was incidental to a lawful arrest effected pursuant to a warrant of arrest. The warrant of arrest was issued by a commissioner upon a complaint which reads as follows:

" 'Southern District of New York, ss.: John F. Kehoe, Jr., being duly sworn, deposes and says that he is a Special Agent attached to the Federal Bureau of Investigation, Department of Justice, and upon information and belief alleges and charges as follows: That heretofore, to wit, on or about the 7th day of June, 1946, at the

Southern District of New York and within the jurisdiction of this Court, Philip Fried, George Neary, Benjamin Fried, Fred Dinglefelder, Edward Terris, and John Birnbaum, the defendants herein, unlawfully, wilfully and knowingly did have in their possession certain goods and chattels knowing the same to have been stolen, said goods and chattels consisting of 256 bales of crude rubber, each bale weighing 110 lbs. apiece, a more exact description being to your deponent unknown, which had theretofore been stolen from a certain truck at the corner of Noble and West Streets, Brooklyn, N. Y., to wit, a truck of the St. George Trucking Co., of 109–115 Montgomery Street, Staten Island, New York City. Said goods and chattels were part of and constituted a foreign shipment of freight from The Reconstruction Finance Corporation, Philippine Islands, consigned to the Rubber Trading Association of New York.

" 'The sources of deponent's information and the grounds of his belief are an investigation conducted by him in the course of his official duties.

" 'Wherefore, deponent prays that a warrant may issue for the apprehension of the above named defendants and that they may be arrested, imprisoned or bailed, as the case may be.'

"Such a complaint will not support a warrant of arrest. United States v. McCunn, D.C.S.D.N.Y.,1930, 40 F.2d 295; United States ex rel. King v. Gokey, D. C. N.D.N.Y.,1929, 32 F.2d 793; Go-Bart Co. v. United States, 1930, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; United States v. Pollack, D.C.N.J., 1946, 64 F.Supp. 554; United States v. Ruroede, D.C.S.D.N.Y. 220 F. 210.

"(2) The search was incidental to a lawful arrest made on probable cause that a felony was committed. Since the arrest was made by Special Agents of the Federal Bureau of Investigation, it would be valid only if the arresting officer had reasonable grounds to believe that there was likelihood of the person escaping. 5 U.S.C.A. § 300a; United States v. Haberkorn, 2 Cir., 1945, 149 F.2d 720.

"No evidence of such belief or of such likelihood was presented upon the hearing.

Nor is there any force in the argument that a private person could have made the arrest without a warrant, New York Code of Criminal Procedure Sections 183 and 184, because a private person could in no event make a search incidental to an arrest.

"(3) The search and seizure were justified by the consent of the petitioner Neary. Normally a consent to search by government agents after an arrest is not to be lightly inferred.

" 'Bearing in mind the important nature of the constitutional right and immunity given by the Fourth Amendment, it seems to me that a trier of the facts should be slow in finding an intentional and voluntary relinquishment of this right by an individual when the effect of the testimony is uncertain.' United States v. Ruffner, D. C. Md., 1931, 51 F.2d 579. Non-resistance is not equal to consent. United States v. Hoffenberg, D.C.E.D.N.Y.,1938, 24 F.Supp. 989.

"Upon the hearing petitioner Nierenberg [i. e., Neary] testified in support of the application. He also called Miss Berke, a bookkeeper, and as a rebuttal witness, Seymour Cohen, an employee of Special Formula Chemical Company. The government called six of the 15 agents who participated in the arrest and search. The arrest and search occurred on September 17, 1946 at the offices and plant of Special Formula [Chemical] Company, which is the trade name under which Philip Fried conducted a rubber cement business. The agents arrived at about 4.30 p. m., and immediately placed Nierenberg under arrest on the charge of knowingly possessing goods stolen in foreign commerce. Other arrests were also made, employees were interviewed and the search was conducted. The entire operation lasted approximately three hours.

"The search was made in two parts: An inspection of the plant, which yielded two bales of rubber believed at the time to be part of the stolen merchandise, but since then returned as innocent goods; an examination of the business records of Special Formula Chemical Company and the seizure of some of them. The government contends that the first search proceeded on an oral consent and the latter on both an oral and written consent. The written consent is upon a prepared form which reads as

follows: 'I, George Neary, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Fleming L. Liggitt and Eldred Wesley Cox, Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to conduct a complete search of the building located at 400 West 219th St., New York City, N. Y. These agents are authorized by me to take from my residence any letters, papers, materials or other property which they may desire.

" 'This written permission is being given by me to the above named Special Agents voluntarily and without threats or promises of any kind.

" '(Signed) George Neary.

" 'Witnesses:

" 'Fleming L. Liggitt, F.B.I., N.Y.C.

" 'Eldred W. Cox, F.B.I., N. Y. C., 9/17/46.'

"It was signed by Nierenberg and witnessed by two agents of the FBI. It is unnecessary to rehearse the testimony. It presents the usual conflict in controversies of this character. The substance of Nierenberg's testimony is that he merely submitted to authority, that he feared the consequences of refusal, and that he was not apprised of his right to refuse. Were I deciding this application on the affidavits initially submitted in this matter, I would be inclined to resolve this issue of fact in favor of the petitioner. The oral hearing has persuaded me to resolve it against him. My reasons are as follows:

"(1) Nierenberg is the general manager of Special Formula Chemical Company. His earnings in 1945 from that enterprise were $20,000. He is also a co-owner of another business enterprise. I mention these facts to indicate that he is not a poor, illiterate, uninformed person, but a citizen of substance and means. He gave every impression of self-confidence, alertness, competency. He is quite the opposite of the cartoonist's representation of The Timid Soul. He is a man of affairs, accustomed to deal with persons in authority and not at all overawed by the badge of office. He conducted himself militantly and skilfully during his cross-examination.

"(2) He testified falsely on some matters, and, in at least one instance, I am convinced that he did so wilfully—in the matter of his foreknowledge of official inspection of the plant in June, 1946. His previous conviction for forgery does not aid his credibility.

"(3) In June, 1946, Special Formula Chemical Company had been searched by FBI agents, with the consent of Fried, and nothing of an incriminating nature had been discovered.

"(4) Nierenberg felt entirely secure in consenting to a search, as there was in fact no stolen rubber on the premises, and the books revealed no acquisition of such rubber as had been stolen. He undoubtedly believed that the exhibition of an attitude of cooperation and of willingness to prove that 'We have nothing to hide' would lead to the same satisfactory result as the June investigation. It is significant that the petitioners did not call Fried to contradict the testimony of Agent Cox, that during the June inspection Fried had said 'that the plant was open for inspection at any time; that they had nothing there that they desired to conceal * * * That any time we desired to look through his plant we should feel free to come and he would be happy to see that we went through the plant.'

"(5) My conclusion is that neither fear nor submissiveness induced the undenied consent, but that experience and a motive to give the appearance of innocence, in the security in which he believed himself to be, combined to induce Nierenberg to give actual and voluntary consent to the search.

"(6) I am convinced that Nierenberg had authority to give consent. He was not only general manager, but testified that he was entitled to 50 per cent of the profits. Except for such matters as check signing, his authority was coextensive with Fried's. Seymour Cohen, an employee, called by the petitioners, referred to Fried and Nierenberg as 'the two bosses.'

"The incident in the course of search during which Nierenberg authorized an employee to take away from the plant a collection of tools further indicates that Nierenberg had authority to authorize the sei-

zure of such material as the Federal agents discovered.

"The application to return the seized books and papers and suppress them as evidence is denied."

No evidence was heard concerning the confessions, as to which the district judge dismissed the petition on the ground that the court lacked all power, before indictment, to suppress the confessions, no matter how illegally obtained. The following facts relating to the confessions were stated in appellants' affidavits and were not controverted in the affidavits filed by the government:

A complaint was filed before a United States Commissioner by an agent of the F.B.I. on August 21, 1946, charging the applicants with illegal possession of a quantity of rubber stolen from foreign commerce. A warrant to arrest was issued at that time upon the complaint.

The appellant, Philip Fried, operated a rubber cement factory under the trade name of Special Formula Chemical Co. at 400 West 219th Street, New York City. At about 4:30 p. m. on September 17, 1946, fifteen armed F.B.I. agents, carrying the above-mentioned warrant, raided this factory and arrested the appellants, George Nierenberg and Benjamin Fried, as well as two others of Fried's employees named in the complaint.

Two F.B.I. agents, at 5:00 p. m. the same day, arrested the appellant, Philip Fried, at his home, 286 East Broadway, New York City, where a search was also conducted, but nothing taken. Two other F.B.I. agents, at 7:30 p. m. the same day, arrested the appellant, Samuel Birnbaum, at his home, 2513 Newkirk Avenue, Brooklyn, New York. Birnbaum was also one of Philip Fried's employees. The agents would not tell Birnbaum upon what charge they were arresting him.

The appellants, Philip Fried, Nierenberg and Birnbaum, requested permission to use the telephone to call a lawyer but were not permitted to do so. None of the appellants, except Birnbaum, had any dinner. Immediately upon arrest Philip Fried, Benjamin Fried and Birnbaum were taken to the office of the F.B.I. in the United States

Courthouse. Nierenberg was taken there at about 7:30 p. m.

All four appellants were kept separate from each other and were questioned without cessation from the time they arrived at the F.B.I. office for many hours thereafter by F.B.I. agents working in relays, and occasionally by an Assistant United States Attorney.

Philip Fried had had one of his kidneys and his spleen removed some years before, had been advised by his physician to avoid excitement, and was confined to a special diet. He had no food during the night except a glass of milk. He was questioned for eleven hours, until 5:00 a. m., September 18, but his statement was not reduced to writing. At this time he was taken to the Federal House of Detention where the prison guards were led by his apparent hysterical condition to inquire whether he should be removed to a hospital.

Nierenberg commenced to give satisfactory answers to questions at some time after midnight, after about four hours continuous interrogation. He signed a written statement at about 4:00 a. m., September 18th, and was then taken to the United States Detention Headquarters. He had no food during this time. Later in the morning of September 18th, Nierenberg was returned to the office of the F.B.I. and interrogated further until shortly before 2:00 p. m. on September 18th, at which time he signed an additional written statement, this being over twenty-one hours after his arrest.

Benjamin Fried did not give satisfactory answers to the questions until about midnight, and signed a written statement at some time after 2 o'clock in the morning of September 18th. He ate nothing during the night.

Samuel Birnbaum refused to answer questions until 1:30 a. m., September 18th, by which time he had been questioned more than five hours. At this time he began to answer questions, and subsequently signed a written statement. Upon his return from the jail the next morning (September 18th) to the F.B.I. office he was again refused permission to make a telephone call.

At 2:00 p. m. on September 18th all four appellants were arraigned before the United

States Commissioner upon the complaint mentioned above.

The following facts relating to the confessions were specifically denied in affidavits filed by the government:

Fried's petition alleged that the agents who arrested him refused to tell him for what he was being arrested; that when he asked permission to call a lawyer he was told he had "plenty of explaining to do" before he could get a lawyer; that the agents who interrogated him threatened him, abused him, and shouted at him, using profane language; that he was reduced to a state of hysteria by the interrogation.

The supporting affidavit of George Nierenberg alleges that the agents who arrested him refused to inform him for what he was being arrested, and told him he "had a lot of questions to answer" before he could get a lawyer; that he could observe the pistols carried by the agents in holsters; that during his interrogation the agents shouted at him, abused him and threatened him; that he told the agents he felt sick and had been hospitalized for twenty-five weeks for colitis during the past three years, but they disregarded his statements; that during the night he told the agents he was hungry, and was given a ham sandwich, which his diet did not permit him to eat; that at 4:00 a. m. on September 18th one of the agents asked him whether Philip Fried had ever been an inmate of an insane asylum; that before he signed his second written statement at 2:00 p. m. on September 18th one of the agents threatened him with physical violence, and after securing the statement laughingly commented to another agent, "We know how to do it, don't we?"

The supporting affidavit of Samuel Birnbaum alleged that the agents who arrested him refused to tell him even whether or not he was being arrested; that during his interrogation the agents told him it would "go easier" with him if he told them what they wanted to know, and that they would "get it if it took them all night"; that on September 18th he heard an agent threaten the appellant Nierenberg during the latter's interrogation.

The supporting affidavit of Benjamin Fried alleged that during his interrogation the agents threatened him; that he was so mentally and physically exhausted by the time he signed his written statement after 2:00 a. m. on September 18th that he fell asleep in his chair.

Title 5 U.S.C.A. § 300a provides: "The Director, Assistant Directors, agents, and inspectors of the Federal Bureau of Investigation of the Department of Justice are empowered to serve warrants and subpoenas issued under the authority of the United States; to make seizures under warrant for violation of the laws of the United States; to make arrests without warrant for felonies which have been committed and which are cognizable under the laws of the United States, in cases where the person making the arrest has reasonable grounds to believe that the person so arrested is guilty of such felony and where there is a likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be immediately taken before a committing officer. Such members of the Federal Bureau of Investigation of the Department of Justice are authorized and empowered to carry firearms."

Wegman, Spark, Hoffman & Burke, of New York City (Richard J. Burke, of New York City of counsel), for appellants.

John F. X. McGohey, U. S. Atty., of New York City (Bruno Schachner and John C. Hilly, both of New York City, of counsel), for United States.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Substantial testimony, the credibility of which was, of course, for the district judge to determine, sustains his conclusion that such authorized voluntary consent was given to the searches as to validate them and the seizures.

2. The district judge refused to consider any evidence whatever concerning the confessions. He ruled, in effect, as follows: Even if government officers were to use the most brutal, coercive methods in obtaining a man's confession to the commission of a crime, a district court would be powerless to prevent the government from presenting that confession to a grand jury in order to

bring about that man's indictment for that crime. We cannot agree, and we therefore reverse and remand on this issue.

 If an article has been illegally seized by a federal official, its potential use as evidence will be restrained by a district court, although no indictment is pending.[1] The reason, as suggested by Judge Sibley,[2] is that the court "may reach forward" to control the presentation, in a case which may come before it, of evidence acquired by unlawful conduct of federal officers. The government, however, argues as follows: (a) This doctrine rests on—is inseparably tied up with—the "property right," of the person from whom the article was taken, to have it returned to him. (b) A confession, even if written and signed, is an intangible which cannot be returned to the confessant; memory of its contents cannot be eradicated from the memories of the officials; the confessant therefore has no "property right in the confession." (c) Consequently, as it cannot be returned to him, an essential condition of its judicial suppression is lacking.

This contention necessarily includes a mistaken assertion: When an article illegally seized by the government is "contraband," so that the petitioner has no "property right" in it, its return to him will be denied, yet its use as evidence will be restrained. Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, provides: "If the motion is granted the property shall be restored *unless otherwise subject to lawful detention*[3] and it shall not be admissible at any hearing or trial." The Advisory Committee's notes report that Rule 41(e) "is a restatement of existing law and practice" (with one exception not here relevant).[4]

The following argument is also made: The suppression, in advance of an indictment, of an illegally obtained confession must rest on the fact that, if there be an indictment, the confession will be excluded at the ensuing trial because of its incompetence or presumed untruthfulness; therefore, if such a confession is thus suppressed, in advance of indictment, it must logically, but absurdly, follow that the court will similarly prevent the possible use before a grand jury of any evidence which for any reason would be incompetent at a trial or which is shown to be untruthful. Not at all. The courts refuse to receive in evidence an unlawfully acquired confession, not because of its presumptive untruthfulness or unreliability or because it is irrelevant, but because of the illegality of the means by which it was acquired.[5]

The government further argues that an indictment founded upon such illicit evidence will do the applicant no harm, since such evidence will not be admitted at the trial which follows the indictment. That is an astonishingly callous argument which ignores the obvious. For a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot be easily erased. In the public mind, the blot on a man's escutcheon, resulting from such a public accusation of wrongdoing, is seldom wiped out by a subsequent judgment of not guilty. Frequently, the public remembers the accusation, and still suspects guilt, even

---

[1] See Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159; Cogen v. United States, 278 U.S. 221, 225, 49 S.Ct. 119, 73 L. Ed. 275; Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950; Cobbledick v. United States, 309 U.S. 323, 328, 329, 60 S.Ct. 540, 84 L.Ed. 783; Go-Bart v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; Turner v. Camp, 5 Cir., 123 F.2d 840, 842; Foley v. United States, 4 Cir., 64 F.2d 1; cf. In re Film etc. Co., D.C., 22 F.2d 837, 839; United States v. Poller, 2 Cir., 43 F.2d 911, 912, 74 A.L.R. 1382; Collins v. Miller, 252 U.S. 364, 369, 40 S.Ct. 347, 64 L.Ed. 616.

[2] Foley v. United States, 5 Cir., 64 F. 2d 1, 3; certiorari denied 289 U.S. 762, 53 S.Ct. 796, 77 L.Ed. 1505.

[3] Emphasis added.

[4] See also the volume published by New York University School of Law on the Federal Rules of Criminal Procedure (1946) 130.

In the Committee's Second Preliminary Draft of February 1944, it cited United States v. Rykowski, D.C., 267 F. 866, 870. See also Voorhies v. United States, 5 Cir., 299 F. 275, 277; United States v. Kaplan, D.C., 286 F. 963, 972, 975; O'Connor v. Potter, D.C., 276 F. 32, 33.

[5] Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166.

after an acquittal.[6] Prosecutors have an immense discretion in instituting criminal proceedings which may lastingly besmirch reputations. That discretion is almost completely unfettered.[7] It should surely not extend so far as to preclude judicial interference with a prosecutor's aim to induce an indictment by offering to a grand jury evidence which is the product of illegal acts of federal officers.

The "third degree" and cognate devices alarmingly persist in this country.[8] The reports of the United States Supreme Court alone disclose eight cases in the six years 1940–1945 in which convictions were reversed because of the use of coerced confessions.[9] The indications are that the following statement, made in 1930 by a Committee of the American Bar Association, could be made today: "It is conservative to say that for every one of the cases which do by a long chance find a place in the official reports, there are many hundreds, and probably thousands of instances of the use of the third degree in some form or other." We have cause for shame as a nation that such foul exploits by government officials are designated "the American method."[10] Until such miserable misbehavior is stamped out, it will remain an empty boast that we have, and that we respect, a Constitution which guarantees civil liberties, blocks representatives of government from lawless incursions on the rights of the individual.[11] As possible pros-

---

[6] See Frank, If Men Were Angels (1942) 316, 330; cf. Landis, The Administrative Process (1938) 95, 110; Black, The Progress of a Criminal Case, 7 Lectures on Legal Topics (1929) 339, 345; Hall, Objectives of Criminal Procedural Revision, 51 Yale L.J. (1942) 723, 741.

[7] Wallace, Nullification: A Process of Government, 45 Pol.Sc.Q. (1930) 347; Frank, If Men Were Angels (1942) 152, 325.

[8] See, e. g., The Third Degree by Chafee, Pollack and Stern (1931), a report to the National Committee on Law Observance and Enforcement; Keedy, The Third Degree and Legal Interrogation of Suspects, 85 Un. of Pa.Law Review (1937) 761; Note, The Third Degree, 43 Harv.Law Rev. (1930) 617, 624, 625; Frank, If Men Were Angels (1942) 317–324; Radin, Pretense and Reality in Criminal Law, 4 Ore.St.Bar Bull. (1939) 134.

[9] Chambers v. Florida, 1940, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; Canty v. Alabama, 1940, 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988; White v. Texas, 1940, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342; Lomax v. Texas, 1941, 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1544; Vernon v. Alabama, 1941, 313 U.S. 547, 61 S. Ct. 1002, 85 L.Ed. 1513; Ward v. Texas, 1942, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663; Ashcraft v. Tennessee, 1944, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Malinski v. New York, 1945, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029.

[10] See Frankfurter, J., in Pennekamp v. Florida, 328 U.S. 331, 350, at page 360, 66 S.Ct. 1029, at page 1044: "Prosecutors who rely on the third degree often assert that it is necessary to ignore constitutional rights in order to discharge their duty of jailing criminals. Not long since, the police commissioner of a large city bluntly said: 'If I have to violate the Constitution or my oath of office, I'll violate the Constitution.' That means that anyone who, before a trial seems to government officers to be a criminal, is not entitled to the civil liberties guaranteed by the Constitution. But that means—what? That the prosecutor is the one to determine—before a trial and conviction in accordance with law—what citizens are criminals. In other words, the police and the prosecuting attorney are to have the right to dispense with the presumption of innocence. They are to decide, unhampered by legal processes, which among our citizens are not entitled to constitutional and statutory rights. You see where that leads: to dictatorship, to absolutism in its most pronounced form. For, if today the prosecutor chooses to deprive of his rights someone whom you (reading the newspaper accounts of a trial) believe to be a criminal, tomorrow he may do the same to you or to me. Once we acquiesce in the doctrine that a prosecutor is to be unhampered in his selection of those men who are to be denied civil rights (prior to and during a trial) solely because, in his uncontrolled judgment, he believes them guilty, we are on the road to tyranny, to dictatorship, to the death of democracy." Frank, loc. cit. 323.

[11] The position is reminiscent of that of Coke. In his Institutes he wrote that "there is no law to warrant tortures in this land, nor can they be justified by prescription. * * *" Yet, said Lea, "in 1603, there is a warrant addressed to Coke and Fleming, as Attorney and Solicitor General, directing them to apply torture to a servant of Lord Hunsdorn, who had been guilty of some idle speech-

ecution of offending officers and civil actions for damages against them seem to have no practical value,[12] the courts, unfortunately, can do little to eliminate these evils; but what slight powers they have to do so they should vigorously exercise. Among those powers is the issuance of orders that screen from scrutiny by grand juries evidence derived from such official illegality.[13]

It is urged that, if motions to suppress confessions before indictment are entertained, the courts and prosecutors will be unduly burdened and decisions of such motions will be made by judges unable to consider the issues as intelligently as the judges presiding at trials. But that argument is equally applicable to motions for suppression, in advance of indictment, of unlawfully seized documents; and, as to them, it has been rejected by the Supreme Court.

■ We do not now decide that here there was any official abuse. We reverse and remand in order that the district court may pass on that issue of fact. Judge A. N. Hand would affirm the district court's order as to the confessions. Judge Learned Hand would suppress any of the confessions shown to have resulted from constitutional violations; to that extent he and I agree; such, therefore, is the decision of this court.

3. I, however, would go further than Judge Learned Hand. The following is thus a partial dissent from that decision.

Even if a confession follows a lawful arrest and does not result from coercive measures violative of the confessant's constitutional privileges, I think a federal district court should suppress it before indictment when—should it not be suppressed and should indictment and trial ensue—the confession would be inadmissible at the trial because federal officers obtained it by means of a violation of federal statute governing their authority. See McNabb v. United States, 318 U.S. 332, 344-346, 63 S.Ct 608, 87 L.Ed. 819, as further elucidated in United States v. Mitchell, 322 U.S. 65, 67, 64 S.Ct. 896, 88 L.Ed. 1140. For, as above stated, the reason for suppressing a confession procured by a violation of a constitutional privilege is solely the illegality of the means used in procuring it; and the means are just as illegal if they consist of official transgression of a federal statute. The F.B.I. and the office of the United States Attorney are but two different branches of the Department of Justice. I think it irrational that one branch of the Department should be allowed to bring about an indictment through evidence which has come into its possession through any illegal acts of another branch. Nor should it be forgotten that the federal judges, too, are part of the federal government.[14] The privileges and immunities of citizens created by the Fourth and Fifth Amendments to the Constitution undoubtedly, at times im-

es respecting King James, and the resultant confession is in Coke's handwriting, showing that he personally superintended the examination." Lea, Superstition and Force (4th Ed.1892) 567.

[12] See Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690, 695; note 16 to the opinion discusses the apparent ineffectiveness of 18 U.S.C.A. § 53a and its predecessor, 18 U.S.C.A. § 53.

18 U.S.C.A. § 631, enacted in 1917, renders subject to fine and imprisonment "an officer who in executing a search warrant willfully exceeds his authority, or exercises it with unnecessary severity." Yet, Lasson, writing in 1937, remarked, "Despite the numerous illegal searches and seizures, however, that have taken place, it seems that this provision of the Act has never been enforced." Lasson, The History and Development of the Fourth Amendment to the Constitution, 55 Johns Hopkins University Studies on Historical and Political Science No.

2 (1937) 123, note 57. The annotations to this section in U.S.C.A. cite no cases.

See Atkinson, Admissibility of Evidence Obtained Through Unreasonable Searches & Seizures, 25 Col.Law Rev. (1925) 11, 22, 23, where it is also shown that civil suits against offending officers constitutes an ineffective remedy; to the same effect, see Note, The Third Degree, 43 Harv.Law Rev. (1930) 617, 624, 625; cf. Grant, Search and Seizure in California, 15 So.Calif.Law Rev. (1942) 138, 145.

[13] Cf. Chief Justice Vinson, then on the Court of Appeals, in Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690, 693: "The IVth and Vth Amendments relate to different issues, but cases can present facts which make the considerations behind these Amendments overlap."

[14] See Holmes, J., in Olmstead v. United States, 277 U.S. 438, 469, 470, 48 S. Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376.

pede the apprehension and conviction of criminals. Further obstacles of that kind have been erected by the F.B.I. statute, 5 U.S.C.A. § 300a which, by imposing limits on the investigatory methods lawfully available to the F.B.I., extends the citizens' immunities. Since Congress is the constitutional agency empowered to create such new immunities by enacting statutes, I think the restrictions put on official behavior by that statute deserve as much respect from the courts as the constitutionally-imposed restrictions.

Opposition to pre-trial suppression of illegally acquired confessions, and even a limited opposition to such suppression when no constitutional but only statutory immunities have been invaded, seem to me to imply criticism of those Supreme Court decisions holding inadmissible any evidence which federal officers obtain unlawfully. I do not join in that criticism. Particularly are those decisions valuable in the case of confessions, since they do something to guard against that most grievous kind of wrong—the conviction of innocent persons.[15] Such wrongs undeniably occur, else the federal and several state governments would not have provided by statute for the award of financial compensation to victims of such misfortunes—in those cases where the error has been discovered.[16]

I am puzzled by the attitude of those who, although sincerely believing in de-

mocracy, characterize such decisions as the "coddling of the criminal classes" and "misguided sentimentality."[17] That attitude, I think, reflects a failure to recognize that, in its criminal procedure, a democratic society perforce pursues conflicting aims—to convict the guilty without endangering the innocent. Continental Europe once widely proclaimed the first aim and neglected the second, acting on the principle that, for "the public good," it is "better that a hundred innocent persons should suffer than that one culprit should escape,"[18] a principle which encouraged the use of torture (including fatigue resulting from sleeplessness).[19] In modern pre-Hitler days, that principle had been generally disavowed in those countries. In our own we have, in theory at least, adopted something like its opposite, aware that, as Jerome Hall puts it, "the easier it is made to prove guilt, the more difficult does it become to establish innocence." For any criminal procedure constructed solely "with professional offenders in mind, or on the supposition that 'the rogues have too many chances to escape' * * * would result in a ritual whose efficiency would be equalled only by its terror." Hall remarks, "There is wisdom in the observation that the *substantive criminal law should be designed for criminals, the procedural for honest people.*"[20]

Holmes' position in that case is ignored by his misguided detractors, like Palmer, who assert that he espoused a "philosophy of force" and was thus, in effect, "a champion of the totalitarian state." See Palmer, Hobbes, Holmes and Hitler, 31 Amer.Bar Ass'n.J. (1945) 569; cf. Frank, Book Review, 59 Harv.L.Rev. (1946) 1004, 1007, 1008 (including note 13).

[15] Borchard, Convicting the Innocent (1933); cf. Frank, If Men Were Angels (1942) 323–324.

[16] In the 16th century, Montaigne said, "How many innocent people have we known to be punished * * *; and how many are there that we have not known of!" Essays, Bk. III, Ch. 13.

[17] Those are Wigmore's much-quoted phrases; see Wigmore, Evidence, 2d Ed., § 2184.

[18] Lea, Superstition and Force (4th Ed. 1892) 486, 487, 514.

[19] Ibid., 515, 535.

[20] Hall, Objectives of Federal Criminal Procedural Revision, 51 Yale L.J. (1942) 723, 728, 730; emphasis added.

Referring to what he calls "the fallacy fetchingly described as 'protection of society against criminals,'" Hall says, "Group security is opposed to individual liberty, with the clear implication that we must choose between them. This separation of group from individual, of society from offender, is one of the most vicious fallacies ever invented. Again it begins with the presumption of guilt. It implies that any method of 'social defense' is permissible after one has been thus prejudged, and that any measures of 'prevention' are proper. Society is composed of individuals, but the logic of the above * * * ideology would place every individual outside the pale—should the occasion * * * arise. As a matter of fact, group security is a function of individual security. * * * Pro tanto does

That observation suggests that the problem before us here cannot be explored adequately without some consideration of a deeper problem which is obscured (1) by the distinction between "substantive law" and "procedure," and (2) by the relative neglect, on the part of most of those interested in "procedure," of its most important component, i. e., judicial fact-finding. The "substantive" legal rules, civil or criminal, embody social policies ("social value judgments"). To enforce, and thus give effect to, such policies is considered one of the principal duties of the courts. They discharge that duty, however, not at wholesale but at retail, by applying those rules in specific law suits to the particular facts of those respective suits as "found" by the courts. As a "substantive" rule merely declares that specified legal consequences will be attached to a specified state of facts, the rule should be operative only in particular instances where those facts actually occurred. Accordingly, the social policy embodied in any such rule is not actually enforced when, in deciding a case, a court, through misapprehension of what actually occurred, applies that rule to facts which in truth never existed. The whole job then miscarries: Mistakenly to apply a rule to non-existent facts—to facts mistakenly "found"—is no less unjust, no less a defective operation of judicial administration, than to apply an erroneous "substantive" legal rule to the actual facts. Either way, the policy expressed in the correct rule is frustrated. An error in "finding" the facts thus yields what might be called "injustice according to law."

The facts involved in any case are past facts. They do not walk into the courtroom. Judicial fact-finding, a human process by which a man or some men attempt to reconstruct a segment of an "objective" past, is necessarily fallible. For it is a job of history-writing, and, like all history-writing, inescapably involves "subjective" factors and encounters other obstacles sometimes insurmountable.[21] But courts cannot shirk that job. And acknowledgment that the process can never reach perfection does not excuse us from rendering it free of all practically avoidable defects. Unfortunately, the major efforts of those who have tried to improve our legal system have been devoted either to improvements in other phases of "procedure" or in the "substantive" legal rules. Those improvements will be needlessly nullified just to the extent that the fact-finding process remains

'protection of society' increase when each individual is protected from indiscriminate and irrational exercise of official power. We may recognize that 'society' denotes a being different from the total number of its units, separated one from the other, and realize at the same time, that 'society' and 'individual' merely designate aspects of human nature, not any actual antithesis."

21 The accurate reconstruction of the "objective" past by a trial court can seldom be assured, because it encounters conflicts in the evidence, "subjective" and other errors in testimony, missing data, and the inescapably "subjective" reactions, to the available data, of the trial judge or jury. See, e. g., In re J. P. Linahan, 2 Cir., 138 F.2d 650, 652-654; Zell v. American Seating Co., 2 Cir., 138 F.2d 641, 647-648; Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 761 note 6; Frank, What Courts Do In Fact, 26 Ill.L.Rev. (1932) 658 at 658-662; Frank, If Men Were Angels (1942) 68, 80, 91-94, 111-118, 270, 271; Frank, Sketch of An Influence, in the volume, Interpretations of Modern Legal Philosophies (1947) 189, 235-236, 259-261; Eg-

gleston, Legal Development in a Modern Community, in the same volume, 167, 184, 188; Radin, Ex Facto Ius: Ex Iure Factum, in the same volume, 578; Radin, Law as Logic and Experience (1940) 47-61. Even Blackstone sensed the problem; see Commentaries, III, 329, 330.

Since court-room reconstruction of the past is history-writing, discussions of the historian's difficulties are pertinent. See, e. g., Allen Johnson, The Historian and Historical Evidence (1926) 21, 22, 42-48, 133, 141, 159-160; Nevins, The Gateway To History (1938) 175, 176, 203; Pirenne, What Are Historians Trying To Do?, in the volume, Rice, Methods of Social Science (1931) 435, 437-444; Frank, Fate and Freedom (1945) 11-15, 18-24, 28-33, 334.

That a trial court acts as an historian, see dissenting opinion in United States v. Rubenstein, 2 Cir., 151 F.2d 915, note 44; cf. Plato, Theaetetus, 200-201; Taylor, Plato (2d Ed.1927) 344; Aristotle, Rhetoric, Bk. I, Ch. 3.

That, even for scientists, "facts" are often not as "hard" or "objective" as they may seem, see Frank, Fate and Freedom (1945) 174-186, 312-315.

insufficiently scrutinized and, consequently, needlessly defective.[22] Fact-finding is today the soft spot, in the administration of justice.[23] In considerable measure that is true because the reformers have largely disregarded the actual fact-finding methods used by the trial courts which, as they are the chief fact-finders, and for other reasons,[24] constitute the most important part of our judicial system; even the procedural reformers have restricted their attention chiefly to those phases of trial court "procedure" which manifest themselves in upper-court and occasional trial-court opinions.

It has been too little noticed that a "substantive legal right"—an "interest" said to be "legally protected" by a "substantive" legal rule—has no practical value when a court by mistakenly mis-finding the facts—because of missing witnesses or documents, or because it believes the testimony of witnesses who in truth are inaccurate, etc.—decides that the claimant has no such "right" or "interest." Doubtless, for analytic purposes, there is often much utility in formally differentiating between "substantive" and "procedural" rights (or "primary" and "secondary," or "antecedent" and "remedial," or "telic" and "instrumental" rights).[25] Once, however, it is stated, in terms of this formal analysis, that a judicial decision is the "result of the application of the [substantive] rule of law to the *facts procedurally established,*"[26] it becomes clear that a mistaken "procedural establishment" of the facts destroys, for court-room purposes, the asserted "substantive right," from which it follows that, so far as courts are concerned, the effective assertion of any "substantive right" depends entirely on the claimant's ability to maintain his so-called "procedural right." The Roman lawyers perhaps sensed this truth when they spoke of the "procedural consumption" of a "right of action" by which it was transformed into a "right to judgment."[27] In other words, for practical court purposes, no "substantive" right exists—whether it be a right asserted by a private person or by the government in its role of vindicator of a "substantive" criminal rule—unless a court gives an enforceable judgment in favor of the alleged rightholder; and, ordinarily, a court will not give such a judgment, even when it uses a seemingly "correct" rule, if it goes wrong on the facts.[28] Of course, similarly a mis-

[22] Cf. Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 769 note 46.

[23] Gall, Decision and Practical Judgment (1946) 42; Frank, If Men Were Angels (1942) 66–127, 269–271, 284–294, 304–305.

[24] The overwhelming majority of cases are not appealed but end in the trial courts.

[25] The several classifications of this sort, by Bentham, Austin, Holland, Salmond, Cook, and others, are conveniently set forth in Kocourek, Substance and Procedure, 10 Fordham Law Rev. (1941) 157. See also Buckland, Some Reflections on Jurisprudence (1945) 101–106; Beale, Treatise on The Conflicts of Law (1935) I, 67, 68; Bowman, Elementary Law (1929) 69, 70; 93; Radin, A Restatement of Hohfeld, 51 Harv.Law Rev. (1938) 1141; Holland, Jurisprudence (13th Ed.1924) 147–148, 322–329.

The theory varies in its formulations, but, in general, runs thus: "Substantive" or "primary" or "antecedent" rights exist before any wrongful act. ("If all went smoothly," such rights "would alone exist," says Holland. "If all men were law-abiding and well-informed, there would be no need of sanctions, and law-courts could go out of business," writes Buckland.) When, however, someone in-vades any "substantive" right, the rightholder acquires, against the invader, a new kind of right, a "secondary" or "remedial" right. To enforce it, to lend it a "sanction," the "law" gives the rightholder a "procedural" (or "instrumental") right to obtain redress in a lawsuit through a court's judgment.

Sometimes it is said that a suit creates a "jural relation" between the parties and the courts; see Millar, Procedure, 12 Encyc. of Soc.Sc. (1934) 439, 449. See also Engelmann, History of Continental Civil Procedure (trans. and edited by Millar, 1927) 305, 365.

[26] Millar, loc. cit. 442; emphasis added.

[27] See Millar, loc. cit., 441; Engelmann, loc. cit., 262, 278, 304–306, 337, 355, 365; Radin, A Restatement of Hohfeld, 51 Harv.L.Rev. (1938) 1114, 1152, 1153. It was said that, with the judgment, a second "consumption" took place: the judgment "consumes" the "procedural relation"; Engelmann, loc. cit., 365.

[28] This is but another way of saying that when a court uses a rule which would be "correct" if the actual facts were those which it "finds," the rule is not the "correct" rule if in truth those "found" facts are not the actual facts.

Of course, a court may blunder into a "correct" decision, i. e., its decision inad-

take in fact-finding may cause an erroneous judgment adverse to one who defends against an asserted claim.

This, perhaps, appears more clearly if we crudely schematize the formal theory of the decisional process (i. e., the theory that a judicial decision or judgment is the product of a "substantive" legal rule applied to the facts of the case) by saying: $R \times F = D$ —when R is the rule, F the facts, and D the decision or judgment.[29] On that basis, an erroneous F will lead to an erroneous D.[30] As the F consists of the trial court's belief as to what were the actual past facts, the F, and therefore the D, will be erroneous if the court reaches its F by reliance on inaccurate evidence.

No matter, then, how excellent the "substantive" legal rules (the R's) and the social policies they embody, specific decisions will go astray, absent competent fact-finding. (Holmes, J., once said that "the only use of the forms is to present their contents, just as the only use of a pot is to present the beer * * *, and infinite meditation upon the pot will never give you the beer.")[31] All of which, I think, goes to show that our trial courts should assume a larger responsibility for the ascertainment, as near as may be, of the actual facts of litigated disputes.[32]

To ensure, then, that "the substantive criminal law" is "designed for criminals," and the "procedural for honest people," it is essential that in criminal prosecutions the courts untiringly seek to eliminate practically avoidable defects in fact-finding, as well as in other aspects of "procedure."[33] In our democratic society, only a hardened cynic will assert that to convict an innocent man, through mistaken fact-finding induced by his coerced confession, should be a matter of no great concern, since the conviction will help to create or preserve public respect for the "substantive" criminal rule which the court applied—although erroneously—fully as much as if the man were guilty, provided only that the mistake is never publicly disclosed.[34] And only such a cynic will say that the public welfare is

vertently may be what it would have been if it had found the actual facts and had applied to them the "correct" rule.

When a "substantive right" is called an "antecedent right," in one sense the antecedence is one of "logical priority" i. e., it serves to explain logically the "procedural right" which results in the judgment. That is, the court (whether or not it explains its decision) is deemed to have found the existence of past facts that invoked a "substantive right" which "procedurally" entitled the claimant to a judgment.

Pertinent here are the interaction of the "substantive" rules and the "facts," the "gestalt" aspect of decisions, and the relation of logic to "rationalizations" in the decisional process. See, e. g., dissenting opinion in Old Colony Bondholders v. New York, N. H. & H. R. Co., 2 Cir.1947, 161 F.2d 413, notes 80 and 81.

As to incorrectible deliberate mis-finding of facts by a trial judge, see dissenting opinion in La Touraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115 at pages 122–124.

Improvement in fact-finding obviously calls for a careful reconsideration of the policies behind the numerous exclusionary evidence rules.

[29] See Frank, What Courts Do In Fact, 26 Ill.Law Rev. 1932) at 649–651; Frank, If Men Were Angels (1942) 77, 78.

[30] Unless, as indicated in note 28, it happens to stumble on the "correct" decision, despite its mistake about the facts.

Incidentally, the discussion in the text more than suggests the fallacy of those who measure legal certainty by the stability or instability of the "substantive" legal rules; see Frank, If Men Were Angels (1942) 288–294.

[31] Letter to Wu, September 10, 1923, reprinted in Shriver, Holmes, Book Notices, etc. (1936) 167.

[32] See Frank, If Men Were Angels (1942) 123–127; Willoughby, Principles of Judicial Administration (1929) 95–98, 206, 207, 213, 214, 457; dissenting opinion in United States v. St. Pierre, 2 Cir., 132 F.2d 837, at 849, note 40, 147 A.L. R. 240.

I do not here refer to "background facts," i. e., "economic and social facts," which are the subject of the so-called "Brandeis briefs"; see Frank, loc. cit., 122 and note.

[33] To be sure, mistaken decisions in civil suits, due to mistakes in fact-finding, may have consequences virtually as grave as those which stem from mistaken convictions in criminal suits: By a wrongful defeat in a civil suit, a man may be ruined and his children may become delinquent, through loss of his livelihood, his savings or his investments.

[34] "This happened in my time," wrote humane 16th century Montaigne. "Certain

similarly served by indictment of the innocent, induced by grand-jury mis-finding of the facts, when an indictment is followed by an acquittal of which the public never learns. As a wrongful indictment inflicts a substantial harm on the indicted person, infringing his "substantive right" to be exempt from such harm, the courts should actively repudiate the cynic's view.[35] Since preventive justice is usually the best sort of justice, the courts, I think, should try, by all feasible means, to forestall such harms. It is not feasible to enjoin the presentation to grand juries of all untrue, irrelevant or incompetent evidence. I think it entirely feasible, however, and eminently desirable, to order pre-indictment suppression of any confession obtained by means of an infraction either of the Constitution or of a statute regulating the federal police.

Affirmed as to the seizures; reversed and remanded as to the confessions.

L. HAND, Circuit Judge.

██ I concur in the result, but I wish to rest my vote upon a very limited ground. It would be an intolerable burden upon the prosecution of crime, if it were possible to test in advance the competency of evidence which an accused, to say nothing of a prospective accused, might be able to show was likely to be used against him. The protection of the individual from oppression and abuse by the police and other enforcing officers is indeed a major interest in a free society; but so is the effective prosecution of crime, an interest which at times seems to be forgotten. Perfection is impossible; like other human institutions criminal proceedings must be a compromise. I agree that now, in spite of much pro-

fessional opinion to the contrary, it has become settled law, as my brother Frank says, not only that the victim may reclaim documents and other property seized in violation of the Fourth Amendment, but that, when these are contraband and need not be returned to him, he may in advance of trial and even of an indictment, secure from a court an order preventing their use as evidence. Although, so far as I know, the same rule has not as yet been extended to confessions procured in violation of the Fifth Amendment, I feel too much the force of consistency not to take this added step. True, judges are not to be reformers, but law which depends upon irrational distinctions is rightly discredited, for one alternative or the other is patently wrong. Since I cannot see any rational basis here for distinguishing between the two Amendments when the situation is so nearly the same, I am content to accept this innovation. Nevertheless, I wish strictly to confine it to the violation of a constitutional right; and to accept it only because of the higher respect in which these are traditionally held. Were it inevitable that all the privileges of an accused should be treated alike, so far as my vote was concerned, I should compel the accused to postpone even a constitutional objection until the trial. I should choose to impose upon him whatever risk that might entail, rather than to hobble the prosecution of crime by mincing the trial into successive separate determinations.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

██ All members of the court agree as to the validity of the searches and seizures. I dissent from the holding of the

men are condemned to death for murder; the sentence, if not pronounced, is at least decided and fixed. At that point the judges are informed, by the officers of an inferior court nearby, that they hold several men in custody who openly confess to that murder, and are able to throw a light on the whole business that admits of no doubt. And yet they deliberate whether they shall interrupt and defer the execution of the sentence passed upon the first accused. They consider the novelty of the case, and its consequence for suspending judgments; that the sentence is juridically passed, and the

judges have no reason to repent of it. To sum up, those poor devils are sacrificed to the form of justice. * * * How many condemnations I have witnessed more criminal than the crime. All this brings to my mind these ancient theses: That he must needs do wrong in detail who would do right wholesale, and injustice in little things if he would achieve justice in great. * * * " Essays, Bk. III, Ch. 13.

35 One wonders whether statutes should not provide governmental compensation for persons wrongfully indicted.

majority that the confession, if invalidly obtained, should be suppressed in advance of trial. Any injustice the petitioners would suffer in case an invalid confession should be used as a basis for an indictment is no greater than they might have to suffer from the consideration by the grand jury of other incompetent evidence. Such danger of injustice is, in my opinion, outweighed by the objection to imposing upon district attorneys the burden of opposing motions to suppress confessions in advance of trial. Such motions have, I think, never been granted in advance of trial where the objection has been made. that they were premature. If we grant this motion, similar applications are quite certain to be made in case of nearly every confession. They will be made before judges who do not have the trial-record before them and often before judges other than those who will preside at the trial, and who will not be able to deal as wisely with the question of admitting or excluding a confession as would the trial judge. See United States v. Lydecker, D.C.W.D.N.Y., 275 F. 976, 978.

. Moreover, the suppression in advance of indictment or trial of evidence derived from an unlawful search was a departure from the English practice adopted, as I believe, because of particular danger to the peace of the community and the security of individuals involved in ransacking dwelling houses and other buildings without probable cause. It was a sanction thought appropriate to prevent such invasions. Motions to suppress in advance of trial were not only allowed but, under the doctrine of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas. 1915C, 1177, were required in order to aid the prosecuting officer by giving him a timely warning of a defendant's position rather than to protect the latter. This requirement was mitigated in Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.

In the absence of a statutory requirement I think it unwise to extend such a remedy to the suppression of confessions in advance of trial. I am confident that it will multiply dilatory motions and impede prosecuting officers without, except in rare instances, affording defendants any relief not available at the trial. I would not extend the remedy allowed in case of unlawful searches to confessions for the sake of consistency because the practical objections outweigh the advantages of a certain logical consistency, and also because the immediate return, upon petition, of papers seized on an unlawful search is only the substitution of a summary remedy for the slow action at law of replevin. An ancillary motion before trial to suppress their use as evidence would seem to be a natural concomitant and, like replevin, has been limited to tangible objects. Indeed, Rule 41 (e) of the Federal Rules of Criminal Procedure, conforming to prior federal practice, allows motions to be made in advance of trials for the return of books, papers and other tangible objects unlawfully seized and for the suppression of their use as evidence, but makes no provision for the suppression of confessions before trial. It seems reasonable to suppose that they were left to be dealt with only by the tribunal before which they were sought to be introduced. So far as I can discover, applications to suppress confessions when made before trial have been denied. People v. Reed, 333 Ill. 397, 164 N.E. 847; Kokenes v. State, 213 Ind. 476, 13 N.E.2d 524; United States v. Lydecker, D.C.W.D.N.Y., 275 F. 976; People v. Nentarz, 142 Misc. 477, 254 N.Y.S. 574. See also Eastus v. Bradshaw, 5 Cir., 94 F.2d 788, certiorari denied 304 U.S. 576, 58 S.Ct. 1045, 82 L.Ed. 1539. In the single case of United States v. Pollack, D.C.D. N.J. 64 F.Supp. 554, suppression was granted, but the objection was not made that the application was premature.

In my opinion the order of Judge Rifkind should be affirmed not only as to the searches and seizures but in all respects.