John MOYER

v.

Herbert BROWNELL, W. Wilson White
and Robert Lees.

Civ. A. No. 19659.

United States District Court
E. D. Pennsylvania.

Jan. 5, 1956.

Robert M. Taylor, Philadelphia, Pa., and Robert Margolis, Bethlehem, Pa., for plaintiff.

Robert Lees, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

The amended complaint in this case seeks equitable relief from alleged contemplated institution by the defendants of criminal proceedings against plaintiff for violation of 18 U.S.C. § 1001[1] in the form of a perpetual injunction restraining the defendants, and all persons acting by, through, from or under them, from presenting to any Grand Jury a financial statement filed by plaintiff with officials of the Internal Revenue Service in November 1951 or any other evidence (most of which was oral) obtained from plaintiff by representatives of the Internal Revenue Service between November 1953 and June 1954[2] in the course of the investigation of certain of his federal income tax returns.[3]

1. Plaintiff contends that defendants will base their criminal action on alleged false statements contained in the financial statement (P2 as explained in greater detail in Findings of Fact Nos. 5 to 8, inclusive).

2. Plaintiff admitted on direct examination by his counsel that in June 1954 he was questioned under oath after being warned that anything he said might be used against him in a criminal proceeding, so that his claim for relief against the use of evidence given without his consent or knowledge of its possible use in a criminal proceeding apparently does not apply to evidence secured by the Government after that time (N.T. 225). Also, plaintiff offered no evidence of any conferences or discussions after June 1954.

3. The original complaint was filed on October 10, 1955, and a preliminary hearing was held on that day, at which time the plaintiff testified. The hearing was continued to October 11 (on which date the defendants filed a motion to dismiss), when plaintiff called two additional witnesses (N.T. 81) and requested a final hearing on October 26, 1955 (N.T. 95). At this October 11 hearing, the United States Attorney for the Eastern District of Pennsylvania (Hon. W. Wilson White, one of the defendants) agreed not to present the matter to the Grand Jury, which was about to convene (N.T. 92), and subsequently the United States Attorney agreed not to take any criminal action against plaintiff on the subject of this case until the trial judge had entered a final order (N.T. 292). The court called to the attention of the attorney for plaintiff, at the conclusion of the October 11 hearing, "my memory of the evidence does not bring the facts of your case within the facts of In re Fried, 2 Cir., 1947, 161 F.2d 453, 1 A.L.R.2d 996, and the other cases you have cited" (N.T. 96–97). These other cases, which had been sub-

■ The answer filed by the defendants raises at least four separate defenses. Although the hearing judge holds that the defendants are entitled to have the complaint dismissed under Rule 41 of Federal Rules of Civil Procedure, 28 U.S.C., for the reasons stated in their First, Second, Third and Fifth Defenses, such holdings can be reached most adequately after consideration of the testimony, as well as the facts admitted in the pleadings.[4] For this reason, Findings of Fact will be made so that the appellate court can enter such judgment or order as it deems appropriate in the event that it should find errors of law in the action taken by the hearing judge.[5]

mitted to the hearing judge on October 10 (N.T. 79), were "United States v. Burdick, 3 Cir., 214 F.2d 768, 772, United States v. Guerrina, D.C., 126 F.Supp. 609, 610, In re Liebster, D.C., 91 F.Supp. 814, 816, Lapides v. United States, 2 Cir., 215 F.2d 253, 254, and United States v. Sineiro, 3 Cir., 193 F.2d 136." On October 21, a discussion of the possibility of plaintiff's filing an amended complaint was held in the chambers of the hearing judge. The final hearing date was postponed from October 26 to October 28 at plaintiff's request (N.T. 100). On October 24 argument was held before the hearing judge on the motion for leave to file an amended complaint and the Government's answer to this motion, which stated:

"The amended complaint in paragraph 7 contains an allegation that the plaintiff filed a financial statement (Treasury Department Form 1461) 'against his will believing he was required to file same to retain his Government and Civil Service position.' Plaintiff testified with respect to the circumstances of the filing of the Form 1461 (P. 19, 20, and 21) and at that time he did not state that the financial statement was filed by him involuntarily or against his will or that he believed that he was required to file this statement in order to retain his Government employment.

"The defendants contend that the amendment of the complaint in this respect is not an amendment to conform the pleadings to the evidence in the case, but is rather an attempt to introduce a new factual issue for determination. Under the facts of the instant case the Government contends that this should not be done."

Leave was granted plaintiff by the hearing judge to file this amended complaint on October 24 and defendant's answer to the complaint was filed on October 27 (defendant's counsel notified counsel for plaintiff they would file an answer to the amended complaint on October 26—see N. T. 101). The defendants moved for the dismissal of the action at the conclusion of plaintiff's case and offered no evidence.

During the hearings, counsel requested leave to file briefs. The plaintiff's brief was received November 25 and the defendant's brief (due to illness of the Deputy United States Attorney handling the case) was received on December 2. Supplemental authorities were filed by both counsel on December 16 and 17. No requests for specific Findings of Fact have been filed.

4. The first defense, that the United States cannot be sued without its consent, is valid since the Government officials named as defendants are not exceeding their powers under these circumstances. See Jacob Hoffman Brewing Co. v. McElligott, 2 Cir., 1919, 259 F. 525; C. A. Weed & Co. v. Lockwood, 2 Cir., 1920, 266 F. 785; Campbell v. Medalie, 2 Cir., 1934, 71 F.2d 671; cf. Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L. Ed. 1209. The second defense, that equitable jurisdiction may not be invoked to restrain the institution of criminal proceedings, is valid since there has been no unlawful search and seizure under the facts of this case and there has been no violation of plaintiff's privilege against self-incrimination. Stefanelli v. Minard, 1951, 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138.

The third defense is valid since Herbert Brownell is neither a resident of nor physically present within the Eastern District of Pennsylvania. 28 U.S.C. § 1391.

The fifth defense is valid as stated, i. e., there has been no unlawful search and seizure and no violation of the defendant's privilege against self-incrimination for the reasons summarized in the Specific Findings of Fact and the balance of the opinion.

5. In view of such decisions of the Third Circuit Court of Appeals, as United States v. Sineiro, 3 Cir., 1951, 190 F.2d 397, where an independent proceeding to suppress evidence was apparently considered proper, and of this District as in United States v. Guerrina, D.C.E.D.Pa. 1955, 126 F.Supp. 609, 611, and the allegations of the complaint that plaintiff

## Specific Findings of Fact

1. The plaintiff, John Milton Moyer, resides at 2139 Freemansburg Avenue, Easton, Northampton County, Pa., and has resided there since 1911. He is 66 years of age. He is a certified public accountant.

2. The plaintiff was employed as an internal revenue agent by the Internal Revenue Service (formerly Bureau of Internal Revenue) from September 13, 1920, until his retirement on January 15, 1954. The Internal Revenue Service is part of the Treasury Department of the United States of America. Plaintiff had his office in the Easton, Pennsylvania, office of the Internal Revenue Service from 1951 until his retirement. This Easton, Pennsylvania, office was part of the Scranton District in 1953 and 1954.

3. Plaintiff had worked a good many fraud cases, about 100, during his period of service as an Internal Revenue Agent. A fraud case is one where there is either a penalty imposed or criminal prosecution recommended. Plaintiff was fully aware of the duty of every agent to report any evidence of fraud he might find. He was also aware of the duty of a revenue agent to report the commission of a crime if he knew of it.

4. He is now receiving a federal retirement pension of $261 per month, which would terminate if he was convicted of a felony (paragraph 5 of Complaint as admitted by the Answer).

5. On or about October 19, 1951, the Commissioner of Internal Revenue, John Dunlap, issued a mimeograph order (P1) to all Internal Revenue Service personnel requiring each of them to file a financial statement (Treasury Department Form 1361—P2). Said mimeograph stated, inter alia, "The questionnaires will be held strictly confidential." [6]

6. "COM:DI," as used in paragraph 4 of P1, refers to Commissioner, Director of Inspection Service.

7. Form 1361(P2) was filed by all Enforcement Revenue employees in November 1951, either with their Group Chiefs or with the Commissioner, Director of Inspection Service.

---

would be denied important constitutional guarantees in the Bill of Rights if the requested injunctive relief was not granted, the hearing judge adopted the position taken by Judge Learned Hand in his concurring opinion in In re Fried, 2 Cir., 161 F.2d 453, 465, 1 A.L.R.2d 996, supra Footnote 3, by considering only such testimony as might be relevant on the claimed denial of plaintiff's rights under the Fourth and Fifth Amendments. The hearing judge recognizes the strong reasons behind the position taken by the First Circuit Court of Appeals in Centracchio v. Garrity, 1 Cir., 1952, 198 F. 2d 382, certiorari denied 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672, and Chieftan Pontiac Corp. v. Julian, 1 Cir., 1954, 209 F.2d 657, which would make any consideration of plaintiff's claimed denial of constitutional rights unnecessary at this time. See Benes v. Canary, 6 Cir., 1955, 224 F.2d 470; Eastus v. Bradshaw, 5 Cir., 1938, 94 F.2d 788; cf. Lapides v. United States, 2 Cir., 1954, 215 F.2d 253. However, it seems most appropriate for the Third Circuit Court of Appeals to adopt the policy to be followed in cases of this type in the Circuit.

6. The first two paragraphs of P1 read as follows:

"1. A duly appointed Congressional Committee and the Treasury Department have concurred that for the best interest of the Service it is desirable for the Treasury Department to require the periodic filing of financial statements by personnel of the Internal Revenue Service.

"2. The very nature of the Internal Revenue Service is such that each of its employees holds a position of public trust in varying degrees of importance. The maintenance of public confidence in the efficiency and integrity of the Internal Revenue Service must be paramount in our thinking. Consequently, it is incumbent upon each of us to do everything possible toward achieving this objective and demonstrating fidelity to our public trust. Hence, there should be no hesitancy on the part of any of our people to give a full accounting of their private financial position to this office. The furnishing of the requested information will be evidence of your full cooperation and of our good faith in proclaiming the integrity of the Service. The questionnaires will be held strictly confidential." The order was approved by the Secretary of the Treasury.

8. Plaintiff's Form 1361 was dated November 26, 1951, signed by him, filed with his Group Chief, Mr. Gilbert, forwarded by Mr. Gilbert to the Internal Revenue Agent in Charge, Philadelphia, and from there sent to Washington, D. C., where it was received by the Director, Inspection Service, on November 30, 1951.

9. Form 1361 filed by plaintiff showed 10 stocks having a total value of $8,900.

10. There is no evidence in the record indicating either that the plaintiff had committed any crime prior to November 30, 1951, when his Form 1361 was received in Washington or that the information on Form 1361 tended in any way to incriminate him as guilty of action previously taken constituting a criminal offense. Plaintiff had no reasonable ground to apprehend danger of criminal prosecution from filing the Form 1361 if the information contained on it was accurate.

11. Plaintiff testified that, although he felt the filing of Form 1361 (P2) was an invasion of his privacy and personal liberty, he filed the form because he thought he would lose his job if he did not file it.[7] He understood why these forms were required by the Secretary of the Treasury. He had no fears in filing the statement. He also did not think the filing of the form was important enough to justify his consulting counsel or writing the Department to determine his rights. Plaintiff certified on the form (P2) that the questionnaire was answered correctly to the best of his knowledge and belief. On cross-examination, plaintiff testified that the information on the Form 1361 filed by him was accurate in every detail but one item, which he got from his wife, and that item was not quite correct. He does not believe he committed a crime in filing the form, apparently, because of his belief that any errors were minor.

12. It was the policy of the Internal Revenue Service to audit all Internal Revenue Agents' returns for the years 1948 to 1951, inclusive. It was not the policy to audit 1952 federal income tax returns of all such agents.

13. On November 10, 1953, correspondence was sent from the Chief of Collection Division at Scranton to the Chief of Audit Division, Scranton District, concerning plaintiff's federal income tax returns.

14. In November 1953, plaintiff received a letter from his current group chief, Mr. Davis, stating that he wanted to see him on an appointed day that month to go over plaintiff's 1951 and 1952 federal income tax returns. On the appointed day, Mr. Davis told plaintiff his dividend income was incorrectly reported on these returns and plaintiff agreed to pay any additional tax resulting from a corrected computation of his dividend income. At or about the time Mr. Davis called on plaintiff to point out the mistakes in his income tax returns, plaintiff submitted an application for retirement on pension.

15. Plaintiff testified that he assumes that approximately $800 in dividends and interest was omitted from his 1951 joint federal income tax return and plaintiff admitted that approximately $1,100 in dividends was omitted from his 1952 joint federal income tax return.[8]

16. The Inspection Service of the Internal Revenue Service investigates complaints concerning conduct of employees

---

7. It should be noted that no contention was made by plaintiff or his counsel, either at the initial hearing on October 10 or at the hearing on October 11, that he had any objection whatsoever to filing the financial statement on Form 1361, marked P1. On October 28 he testified that on October 10 he had forgotten that he had filed the form because he might lose his job.

8. The fact that plaintiff considered that these errors were ordinary errors which revenue agents never reported for criminal action (N.T. 57 and 58) would not seem significant in the absence of a showing that this was the view of a revenue agent disinterested in the outcome of this litigation, particularly in view of Findings of Fact 9 and 15.

of the Internal Revenue Service and investigates any violations of Federal statutes by members of that Service. The Inspection Service commenced a conduct case investigating plaintiff on December 8, 1953, as the result of correspondence from the District Director of Internal Revenue dated 11/24/54. This case concerned incorrect 1952 income tax returns filed by plaintiff. The Inspection Service requested plaintiff's Form 1361 (P2) from Washington on December 10, 1953. No representative of the Inspection Service was present at any of the conferences attended by plaintiff which were subjects of testimony in this case. The investigation of the Inspection Service was entirely independent of that made by the Audit Division and that made by the Intelligence Service. Mr. Kratenmaker of the Inspection Service did talk to Mr. Brownell, Mr. Davis and Mr. Lawlor (Director of Internal Revenue) on December 14, 1953. In many cases investigated by the Inspection Service, no criminal prosecution results and a letter of reprimand may be recommended. Plaintiff's Form 1361 was received from Washington in the Office of the Regional Inspector on or about January 17, 1955.

17. On or about December 16, 1953 (see P4), plaintiff received a letter from R. P. Brownell, Chief of Audit of the Scranton District of the Internal Revenue Service, asking him to come to Scranton on December 17, 1953, to discuss his income tax returns and to bring a copy of the financial statement on Form 1361 (P1). Mr. Davis and Mr. Brownell were both present at this conference in Scranton. Plaintiff was asked to prepare a list of his securities and the dividends declared on them since 1946. He was asked to bring this data to Scranton so that the investigation could be completed prior to plaintiff's contemplated retirement date of 12/31/53. This list was subsequently either sent or taken to Mr. Brownell at Scranton. Plaintiff testified that Mr. Brownell informed him at that meeting, after looking at his Form 1361, for a few minutes, "that it (P1) looks pretty good to me."

18. Shortly before Christmas 1953, Mr. Davis and Mr. Feldman (a revenue agent) came to plaintiff's office in Easton. Mr. Feldman spent the whole day (and possibly part of another day) going over plaintiff's federal income tax returns for the calendar years 1948–1952, inclusive. At this time, plaintiff gave Mr. Feldman his bank book. Also, Mr. Feldman submitted to plaintiff a net worth statement which he said indicated plaintiff owed additional income tax. Plaintiff stated that he would prepare some figures to show he owed nothing on a net worth basis. Plaintiff emphasized that he volunteered to prepare these net worth figures which were to be submitted as soon as they were prepared. Plaintiff testified that Mr. Davis returned late in the day and said "Don't worry, John. Everything will be all right."

19. Between Christmas and January 14, plaintiff took the net worth statement prepared by him, showing his net worth as of the end of each year from 1948 to 1952, inclusive, to a conference at Scranton at which Messrs. Feldman, Davis and Brownell were present. This net worth statement showed that at the beginning of the period (December 31, 1948) plaintiff had $10,000. At this conference, Mr. Brownell said to him, "This man is in a tax jam—let him take the consequences."

20. About January 14, 1954, plaintiff attended a meeting with Mr. Brownell and Mr. Davis at which time there was given plaintiff a letter proposing his suspension as a revenue agent for filing a grossly incorrect tax return. An application for leave to start January 14, 1954, filed by plaintiff at Mr. Brownell's suggestion, was disapproved.

21. The function of the Intelligence Service of the Internal Revenue Service is to investigate income tax fraud cases. On January 18, 1954, the Chief of the Audit Division at Scranton, Pennsylvania, referred plaintiff's income tax returns to the Intelligence Division, Scran-

ton. Plaintiff's Form 1361 (P2) did not reach the files of the Intelligence Service until March 1954. Plaintiff was never questioned by the representative (Mr. Hickey) of the Intelligence Service assigned to this case about his Form 1361 (P2) and this form was not used as a basis for Mr. Hickey's report, to which there was attached a copy of the form as an exhibit.

22. In the latter part of June 1954, as a result of a visit to plaintiff's home by Chief Intelligence Agent Tomlinson and Special Agent Hickey, plaintiff went to the Easton office of the Internal Revenue Service the following Monday for a conference with Messrs. Feldman, Hickey and Tomlinson concerning his income taxes. Plaintiff was placed under oath by Special Agent Hickey before giving testimony at this time and he was warned that any information he gave would be used against him. At that time, plaintiff answered a great many questions voluntarily but he states that he still did not feel criminal prosecution was involved because less than $10,000 of additional tax was in issue.

23. Plaintiff gave all the information furnished to the Internal Revenue Service from November 1953 through June 1954 voluntarily because he felt he had done nothing wrong and that any additional tax would be nominal. He felt the revenue agents could not find any substantial tax due if they hunted for two years.[9]

24. Plaintiff testified that he had received instructions from the fraud section in Philadelphia that there should be no criminal prosecution for any additional federal income tax found to be due unless such additional tax exceeded $10,-000.

25. During the period from November 1953 until January 1954, there was no mention of possible criminal prosecution in any of the conferences concerning plaintiff's 1951 and 1952 federal income taxes.

26. There is no evidence whatever that government representatives used any coercion, force, stealth, deceit or misrepresentation in securing information or papers from plaintiff concerning his federal income taxes or financial situation in the period from November 1953 to June 1954.

27. Defendant Herbert Brownell is Attorney General of the United States of America. Defendant W. Wilson White is United States Attorney for the Eastern District of Pennsylvania. Defendant Robert Lees is an Assistant United States Attorney for the Eastern District

9. Examples of statements in the record showing the plaintiff's state of mind are as follows:

"I thought I would get a bill for a few dollars I owed and that was all there was to it, because I knew there was no fraud involved. I knew that I owed a few dollars on dividends for '51 and '52 and that is all there could be to it." (N.T. 73.)

"Well, when you find minor errors like this, I certainly never thought that criminal prosecution was involved at all. That was the most remote idea I ever had, because I have checked tax returns where there is three, four thousand dollars actual tax on omission of dividends. I didn't go ahead and report it and ask for an investigation." (N.T. 74.)

At page 78, he testified:

"Q. So that in all the time afterwards when you talked to the agents, you did so entirely voluntarily and entirely at your own free will, because you had nothing to hide, is that right? A. Absolutely, I had nothing to hide at all."

At page 289, he testified:

"The Court: Now, as I understand it—and if I am wrong I want you to say so.

"The Witness: Yes.

"The Court: That what was behind your mind, in your mind during this period was that you had not done anything wrong that would result in any substantial tax?

"The Witness: Yes, sir.

"The Court: And, therefore, you were quite happy to give all these statements?

"The Witness: Yes, Your Honor.

"The Court: Is that correct?

"The Witness: That is correct.

"The Court: And that was what was behind your mind during all this period?

"The Witness: Yes, sir, Your Honor, that is correct.

"The Court: And that motivated your actions?

"The Witness: Yes, sir."

of Pennsylvania (Par. 4 of Complaint as admitted by the Answer).

## Discussion of the Facts

It is impossible to reconcile all of the plaintiff's testimony, which was inconsistent in several particulars.[10] The hearing judge believes these inconsistencies primarily resulted from poor memory which is not uncommon in a person of plaintiff's age (66). On one occasion the plaintiff only reluctantly admitted a relevant fact when the court took over the questioning because of plaintiff's unwillingness to answer a question asked of him by counsel for the defendants (N. T. 253).[11] After the court had asked the question three times, the plaintiff finally gave this answer:

"Well, I have to tell the truth, yes, some one shouted at me. Mr. Brownell shouted at me, sure."

■ Since plaintiff is asking for extraordinary equitable relief and has the burden of producing clear evidence to support his case, in view of the denials of plaintiff's allegations by the answer [see Greenfield v. Blumenthal, 3 Cir., 1934, 69 F.2d 294, 298], the quality of his testimony and his failure to produce corroborating testimony has some significance.[12] Plaintiff produced no one to support his contention that his Group Chief at the time, Mr. Gilbert, had advised him and the other revenue agents in positions similar to his that they should file Form 1361 (P2) or else (N.

10. Among the inconsistencies in plaintiff's testimony, which the court believes are due to poor memory, are the following:

a. On October 10, he testified that he had known R. P. Brownell since approximately 1935 and was "quite friendly" with him (N.T. 43, see also N.T. 218). Yet on October 28, he testified that he told Mr. Davis in November 1953 (N.T. 284): "* * * conditions under Mr. Brownell are so—are so bad that—and he has been after me more or less for the last several years, and I said one of these days I will just have to retire, I said." Also, he testified on October 28 that Mr. Brownell shouted at him (N.T. 254) and refused to give him a retirement application (N.T. 259), which hardly seems friendly, much less quite friendly.

b. The difference in his testimony on October 10 as opposed to October 28, concerning the filing of the Form 1361 in November 1951, and his failure to remember on October 10 that his group chief had said the form should be filed "or else." (Compare N.T. 21 ff. with N.T. 188 ff. and 235 ff.)

c. He testified positively that the last meeting he had with Mr. Brownell in January 1954 was the one at which Mr. Brownell shouted at him and failed to remember the meeting at which Mr. Brownell gave him the letter proposing his suspension. (N.T. 260–3.)

d. On October 10, plaintiff testified that he never had a conference relative to Form 1361, whereas on October 28 he testified that he was asked to bring this form to a conference at Scranton in December 1953 and did bring the form to

that conference, where it was subject to comment by Mr. Brownell (N.T. 195–197 and 247–248).

e. On the one hand, plaintiff testified that he was asked in December 1953 to prepare a statement including dividends received since 1946 (N.T. 25–26 and 196) and, on the other hand, he testified that the revenue agent (Mr. Feldman) investigating his return "had more information about dividends than I did" and no further questions were asked him about dividends (N.T. 204) after the initial November 1953 meeting, when the 1099 Forms were exhibited to him.

11. At least on one other occasion, hesitation in answering a question by the witness, combined with an interruption by his counsel, resulted in leaving a question unanswered, which answer may, or may not, have been pertinent; (N.T. 70–72) where the question concerned the difference between the figures shown on the Form 1361 and the figures shown on the net worth statement prepared by plaintiff in 1953 as of December 31, 1950, and December 31, 1951, in addition to other dates. Other examples of difficulty in securing answers readily are contained at N.T. 239–240 and 268–271.

12. The importance of clear, equitable grounds to support a proceeding of this nature has been repeatedly emphasized. See Centracchio v. Garrity, 1 Cir., 1952, 198 F.2d 382, 386 & 388, certiorari denied 344 U.S. 866, 73 S.Ct. 108, 97 L. Ed. 672, and cases there cited; cf. Lapides v. United States, 2 Cir., 1954, 215 F.2d 253.

T. 188–190, cf. N.T. 241). He also asked none of the employees of the Internal Revenue Service who had been present at the various conferences in 1953 and 1954 at which he gave information which his complaint seeks to suppress, about these conferences, although several of them (Mr. Davis, Mr. Feldman and Mr. Hickey) were present in the courtroom at the hearing on October 28 (N.T. 272–273). Plaintiff produced no testimony to corroborate his contention that he had received instructions from the fraud section in Philadelphia that there should be no criminal prosecution for any tax involving less than $10,000 (N.T. 215–216, 276 and 281), even though Mr. Hickey, of the Fraud Section (Intelligence Service), was on the stand both at the hearing of October 11 (N.T. 82–84) and at the hearing of October 28 (N.T. 155–160).

*I. Plaintiff's request for a protective injunction limiting the use of the Form 1361 signed by him in November 1951 in criminal proceedings and for its return to him.*

The decisions of the United States Supreme Court make clear that the Executive Department of the Government has broad powers over Government employees by virtue of Article II, Section 3, of the United States Constitution, which provides that the President, in whom is vested the "Executive Power" by Article II, Section 1, "shall take Care that the Laws be faithfully executed." For example, it has been consistently

13. In the Shurtleff case, 189 U.S. at pages 317 and 318, 23 S.Ct. at page 537, the court said:

"In making removals from office it must be assumed that the President acts with reference to his constitutional duty to take care that the laws are faithfully executed, and we think it would be a mistaken view to hold that the mere specification in the statute of some causes for removal thereby excluded the right of the President to remove for any other reason which he, acting with a due sense of his official responsibility, should think sufficient.

\* \* \* \* \* \* \* \*

"It is true that, under this construction, it is possible that officers may be

held that the President has virtually unlimited power of removal of employees, such as plaintiff, under this Constitutional provision. See Shurtleff v. United States, 1903, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828;[13] Myers v. United States, 1926, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160. In the Myers case, 272 U.S. at page 135, 47 S.Ct. at page 31, the court said:

"The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which article 2 of the Constitution evidently contemplated in vesting general executive power in the President alone. Laws are often passed with specific provision for the adoption of regulations by a department or bureau head to make the law workable and effective. The ability and judgment manifested by the official thus empowered, as well as his energy and stimulation of his subordinates, are subjects which the President must consider and supervise in his administrative control."

Similarly, in United Public Workers of America v. Mitchell, 1947, 330 U.S. 75, at page 99, 67 S.Ct. 556, at page 569, 91 L.Ed. 754,[14] the court said:

removed for causes unconnected with the proper administration of the office. That is the case with most of the other officers in the government. The only restraint in cases such as this must consist in the responsibility of the President, under his oath of office, to so act as shall be for the general benefit and welfare."

14. In Footnote 34 on page 99 of 330 U. S. 67 S.Ct. at page 569, the court used this language:

"When in 1891, New Bedford, Mass., under a rule removed a policeman for political activity, an opinion by Mr. Justice, then Judge, Holmes disposed summarily of McAuliffe's contention that the rule invaded his right to express his po-

"Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection."

■ The above decisions and the cases cited in them make clear that the Executive Department has broad authority to take such action as is necessary, within such reasonable limitations as may be prescribed by Congress, in order to take care that the laws are "faithfully executed."

Section 161 of the Revised Statutes, 5 U.S.C.A. § 22, has for many years contained this provision:[15]

"The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers, and property appertaining to it."

■■ In view of this statute, and the above-mentioned decisions, the hearing judge can see no legal objection to the action of the Secretary of the Treasury and his subordinate, the Commissioner of Internal Revenue, in requiring the employees of the Internal Revenue Service, such as plaintiff, to file Form 1361 by the terms of the letter of October 19, 1951 (P1), in order to proclaim "the integrity of the Service", which integrity had become subject to question as the result of the widely publicized actions of a few faithless employees who did not discharge their responsibilities in enforcing the income tax laws.[16] It would seem legal to provide that persons who do not file statements of this type under the circumstances existing in October 1951 shall not continue as Government employees in the same way that it is legal to provide that persons who engage in certain forms of political activity may not continue as Government employees. This language of the New Jersey Federal District Court concerning an employee

litical opinion with the epigram, 'The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.' McAuliffe v. [City of] New Bedford, 155 Mass. 216, 220, 29 N.E. 517."

15. See Carter v. Forrestal, 1949, 85 U.S. App.D.C. 53, 175 F.2d 364, 366, and cases there cited.

16. The court is entitled to take judicial notice of the situation confronting the Secretary of the Treasury and the Commissioner of Internal Revenue in the summer and fall of 1951. See Part I of Hearings Before A Subcommittee of Committee on Ways and Means, 82nd Congress, concerning administration of Internal Revenue laws and entitled "Internal Revenue Investigation," and 90th Annual Report of the Commissioner of Internal Revenue for the Fiscal Year Ended June 30, 1952 (Treasury Department Document No. 3182, U. S. Govt. Printing Office, 1953). At page 36 of this report, the following paragraph appears:

"*Employees' financial statements*, Form 1361.—In an effort to isolate the relatively few employees who might have realized financial gains in an unauthorized manner by reason of their official positions, financial statements and related instructions were drafted and distributed to about 32,000 employees. As of June 30, 1952, approximately 31,500 of these statements had been analyzed and closed. One resignation and one removal from the Service have resulted from unwillingness to execute such statements. Difficulties were met in a few cases, but the vast majority of the employees who received them fully completed the statements. It is intended that the periodic filing of financial statements be required."

See also page 86 (particularly the third paragraph from the bottom of page) and the following paragraphs on page 95:

"These measures have been augmented and strengthened by other actions designed to eliminate any who are unworthy and to assure that only persons of integrity and competence are admitted to and retained in the service.

"Some 32,000 internal revenue employees holding positions of trust are now required periodically to fill out detailed financial questionnaires, and to disclose any outside interests that might bear on their Bureau employment."

discharged for violation of the Hatch Political Activity Act, 5 U.S.C.A. § 118i ff., would seem pertinent:

"The constitutional privilege against self-incrimination cannot be invoked unless the witness is called upon to give evidence which will expose him to either criminal prosecution or imposition of a penalty under a federal law. Boyd v. United States, 116 U.S. 616, 633 et seq., 6 S.Ct. 524, 29 L.Ed. 746; United States v. Murdock, 284 U.S. 141, 148 et seq., 52 S.Ct. 63, 76 L.Ed. 210. The testimony which the petitioner gave at the hearing, and without objection, was not of such a nature as to expose him to either of these consequences. The political activity in which the petitioner admittedly engaged, and concerning which he gave testimony, warranted nothing more than the imposition of a remedial sanction, to wit, removal from his position.

"The imposition of such a remedial sanction, although it may be of serious consequence to the person affected, may not be regarded as the forfeiture of a right; it is our opinion that it is nothing more than the withholding of a privilege. A person may have a right to qualify for and hold 'public office,' but he has no right to 'public employment;' the latter is nothing more than a privilege which is subject to termination at the will of the employer, subject only to the applicable civil service laws."

Pfitzinger v. United States Civil Service Commission, D.C.N.J.1951, 96 F.Supp. 1,

2–3, affirmed per curiam 3 Cir., 1951, 192 F.2d 934.

■ The hearing judge has difficulty in understanding the argument of plaintiff's counsel that he is entitled to a return of his Form 1361(P2) under the terms of the Fourth and Fifth Amendments.[17] There is no evidence whatsoever in the record indicating that the contents of Form 1361(P2) indicate, or are proposed to be used to prove, that plaintiff is guilty of any crimes other than those involved in making false statements in it (see Finding of Fact No. 10). Under such circumstances, the federal courts have consistently held that the Fifth Amendment does not provide immunity for giving, voluntarily or under compulsion, *false* testimony, unless the compulsion requires the giving of statements which are false and this was not the situation in this case.[18] There is no evidence in the record of any compulsion on plaintiff to certify to false information in this statement. The authorities cited above supporting the right of the Government to require the filing of such a statement by such an employee as plaintiff make clear that no unlawful search or seizure is involved. Plaintiff puts strong reliance on Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. This case held that the Fourth Amendment was violated by a statute requiring production of papers only because the statute stated that, upon failure of the defendant to produce, the Government's allegation of what was stated in the papers would be taken as confessed.[19] Neither the letter of Octo-

---

17. This argument is covered at pages 16 to 18 of plaintiff's brief but the cases there cited do not seem to the hearing judge to be applicable.

18. Claiborne v. United States, 8 Cir., 1935, 77 F.2d 682, 690; United States v. Miller, D.C.E.D.Pa.1948, 80 F.Supp. 979, 982, and cases there cited.

19. 116 U.S. at pages 621–622, 6 S.Ct. at page 527 (the Boyd Opinion), the court said:

"But, in regard to the fourth amendment, it is contended that * * * (the act) of 1874 * * * is free from constitutional objection, because it does not authorize the search and seizure of books and papers, but only requires the defendant or claimant to produce them. That is so; but it declares that if he does not produce them, the allegations which it is affirmed they will prove shall be taken as confessed. This is tantamount to compelling their production, for the pros-

ber 1951 (P1) nor any other requirement of the Treasury Department stated that Government allegation of what should be contained on plaintiff's Form 1361 would be deemed to be true if he failed to file the form.

▆▆▆▆ Plaintiff also requests that the defendants be restrained from using the Form 1361(P2) in any criminal proceeding against him under the Act of June 25, 1948, c. 645, 62 Stat. 749, 18 U.S.C.A. § 1001.[20] He contends that the filing of this form is not within the jurisdiction of the Treasury Department and that the Act only contemplates "the filing of a claim which is fraudulent on its face in order to defraud the government of funds." For the reasons stated above, the hearing judge holds that the filing of this form was within the jurisdiction of the Treasury Department. As to the second contention, the cases are contrary to plaintiff's position. United States v. Gilliland, 1941, 312 U.S. 86, 94, 61 S.Ct. 518, 85 L.Ed. 598; United States v. Bramblett, 1955, 348 U.S. 503, 507, 75 S.Ct. 504.[21] In the Gilliland case, the Supreme Court said, 312 U.S. at page 94, 61 S.Ct. at page 523, that the 1934 amendment to the basic Act, which is now contained in 18 U.S.C.A. § 1001, omitted "the limiting words which had been deemed to make the former provision applicable only to cases where pecuniary or property loss to the government had been caused." In United States v. Marzani, D.C.1947, 71 F.Supp. 615, affirmed D.C.Cir.1948, 168 F.2d 133, affirmed per curiam by divided court 1948, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431, the defendant, a conditional government employee, was convicted under 18 U.S.C.A. § 1001 of giving false statements to his superiors, representatives of the Federal Bureau of Investigation,

---

ecuting attorney will always be sure to state the evidence expected to be derived from them as strongly as the case will admit of. It is true that certain aggravating incidents of actual search and seizure, such as forcible entry into a man's house and searching among his papers, are wanting, and to this extent the proceeding under the act of 1874 is a mitigation of that which was authorized by the former acts; but it accomplishes the substantial object of those acts in forcing from a party evidence against himself. It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the fourth amendment to the constitution, in all cases in which a search and seizure would be, because it is a material ingredient, and effects the sole object and purpose of search and seizure."

The court then went on to consider whether this search and seizure was unreasonable on the facts present in the Boyd case. As stated above, the requirement of filing this form was not unreasonable in the facts of this case. Cf. Shapiro v. United States, 1948, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787.

20. This act provides:
"Whoever, in any matter within the jurisdiction of any department * * * of the United States knowingly and willfully * * * makes any false * * * statements or * * * makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000. or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 749."

The hearing judge refused to permit testimony which was offered at the hearing to prove that any errors in the form P2 were due to mistakes of plaintiff's wife. This testimony is clearly inadmissible in a proceeding such as this, but may be admissible at any criminal trial. See the comment on Second Defense in Footnote 4 above.

21. The following cases are examples of decisions where this statute has been applied in situations where there was no monetary loss to the Government: United States v. Goldsmith, 2 Cir., 1940, 108 F.2d 917, certiorari denied 309 U.S. 678, 60 S.Ct. 715, 84 L.Ed. 1022; Hupman v. United States, 6 Cir., 1955, 219 F.2d 243, certiorari denied 349 U.S. 953, 75 S.Ct. 882, 99 L.Ed. 1278, cf. United States v. Valenti, 3 Cir., 1953, 207 F.2d 242; United States v. Moore, 5 Cir., 1950, 185 F.2d 92, 96. The broad scope of 18 U.S.C.A. § 1001 is emphasized in United States v. Gilliland, supra, 312 U.S. at page 93, 61 S.Ct. at page 522, and Cohen v. United States, 9 Cir., 1953, 201 F.2d 386, 392, and cases cited in those cases.

and others investigating him. His contention that his false answers were given in an informal conference with his fellow workers, which is very similar to one of plaintiff's contentions here, was rejected by the Court of Appeals at pages 141–142 of 168 F.2d.

 Plaintiff also contends that the statute of limitation expired on November 26, 1954, as far as any proceeding against him under 18 U.S.C.A. § 1001 is concerned. See Act of June 25, 1948, c. 645, 62 Stat. 828, 18 U.S.C.A. § 3282. Defendants contend that prior to the expiration of the statutory period on November 26, 1954, Section 10 of Public Law 769, passed on September 1, 1954, 68 Stat. 1145, c. 1214, extended the statutory period from three years to five years, so that it will not expire until November 26, 1956.[22] Subsection (a) of Section 10 of Public Law 769 substitutes the word "five" for the word "three" in the basic 1948 Act and Section 10(b) of this Act provides as follows:

> " 'The amendment made (to this section) by subsection (a) (of such Act) shall be effective with respect to offenses (1) committed on or after the date of enactment of this Act (Sept. 1, 1954), or (2) committed prior to such date, if on such date prosecution therefor is not barred by provisions of law in effect prior to such date.' " 18 U.S.C.A. § 3282 note.

Such an extension of the statutory period before it has expired has been held valid by Federal courts. Falter v. United States, 2 Cir., 1928, 23 F.2d 420, certiorari denied 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003; United States v. Ganaposki, D.C.M.D.Pa.1947, 72 F.Supp. 982.

II. *Plaintiff's request for a protective injunction limiting the use in criminal proceedings of oral and written statements submitted by him to revenue agents from November 1953 to June 1954, inclusive.*

The oral and written evidence given by the plaintiff during this period and the conditions under which it was given are summarized in Findings of Fact Nos. 13, 14, 16 to 26, inclusive.

### A. *Fourth Amendment*

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

 The importance to political liberty and the welfare of our country of this Constitutional provision and the language of the Fifth Amendment cannot be over-emphasized. These amendments should receive a liberal construction to prevent any depreciation of the rights of our citizens by well-intentioned but mistakenly over-zealous executive officers. On the other hand, this court has no right to extend the meaning given to the language in these Constitutional provisions by the appellate courts of the United States.[23]

22. The plaintiff contends that the extension of the statutory period in Section 10 only applies to certain offenses specifically listed in Section 1 of P.L. 769. Since this argument has been fully discussed and rejected in a recent, persuasive opinion by Judge Wortendyke, the reasoning will not be repeated here. See United States v. Kurzenknabe and Scher, D.C., 136 F.Supp. 17.

23. The hearing judge has given consideration to the many decisions cited by counsel for plaintiff and believes the following comment of the United States Supreme Court in Cohens v. Commonwealth of

Virginia, 1821, 6 Wheat. 264, 399, 5 L. Ed. 257, is applicable to those which are not specifically referred to in this opinion:

> "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care and considered in its full extent. Other prin-

Any seizure of papers or other tangible articles of a person by coercion, stealth, deceit or misrepresentation is an unreasonable search and seizure under the Fourth Amendment. See Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.[24] Any requirement that a person produce papers indicating that he is guilty of a crime to an official of the Federal Government is an unreasonable search and seizure. See Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. However, there has been no misrepresentation, deceit, stealth, coercion or requirement to produce evidence during this period.[25] The bank books, net worth statements, and any other papers submitted by plaintiff were produced voluntarily. See Findings of Fact Nos. 18, 23 and 26.

### B. Fifth Amendment

The Fifth Amendment to the Constitution of the United States provides that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law * * *." The Federal courts have consistently held that neither the privilege against self-incrimination granted to the plaintiff by this language nor the due process clause preclude the admission into evidence of documents and oral evidence voluntarily given to a revenue agent in a civil tax investigation, even though the plaintiff was not warned of his Constitutional rights and did not anticipate criminal prosecution. Morris v. United States, 9 Cir., 1926, 12 F.2d 727, 729; Hanson v. United States, 8 Cir., 1950, 186 F.2d 61; Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887, 892–893; Scanlon v. United States, 1 Cir., 1955, 223 F.2d 382, 384–385; United States v. Burdick, 3 Cir., 1954, 214 F.2d 768, 773–774, vacated and remanded on other grounds 1955, 348 U.S. 905,

ciples which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

24. At page 312 of 255 U.S., at page 266 of 41 S.Ct., it is pointed out that if a paper is lawfully obtained (such as the net worth statements voluntarily furnished by plaintiff—see Findings of Fact Nos. 18 and 19) "it would have been competent * * * to prove any crime against the accused as to which they constituted relevant evidence", even though the crime is other than that described in the affidavit attached to the search warrant.

25. Plaintiff argues that deception was involved because he was lulled into a feeling that only a civil proceeding would result from the conferences when criminal prosecution was contemplated. The record fails to support plaintiff's argument, except as to the June 1954 conference which is discussed below. At the very first conference with Mr. Davis (his Group Chief) in November 1953, plaintiff admitted that he said to Mr. Davis, Mr. Brownell (his supervisor as Chief of Audit) "has been more or less after me for the past several years" and conditions are "so bad" that one of these days I will have to retire (N.T. 284).

This does not depict the situation of a man who felt he had nothing to fear from his superiors. Also, plaintiff's 1952 return was investigated at the first conference and it was not the normal procedure (see Finding of Fact No. 12) for the 1952 returns of all revenue agents to be investigated. There is nothing to show that any criminal prosecution was contemplated until the matter was referred to the Intelligence Division after the last January 1954 conference (neither Mr. Hickey nor Mr. Tomlinson appeared until the June 1954 conference). There is nothing to show that the Inspection Service was doing anything more than starting his investigation in December 1953 and the first half of January 1954 (see Finding of Fact No. 16). There is no evidence whatever that the Inspection Service contemplated recommending any discipline or criminal prosecution for plaintiff at that time. The January conference, when he was given his letter of proposed suspension, was held after all the conferences concerning his tax returns and there is no testimony that he furnished any information at that conference (N.T. 261–3). The factual situation present in the cases cited by plaintiff's brief (page 20 ff.) on this point are far different from the facts shown by this record.

75 S.Ct. 311.[26] The testimony in this case does not establish that the plaintiff was under any compulsion in giving evidence to the representatives of the Internal Revenue Service during the period from November 1, 1953, to January 15, 1954, and indicates that he acted freely

26. As has been carefully pointed out by Dean Wigmore (Section 2266 of Wigmore on Evidence, 3rd Ed.) and Mr. Justice Rutledge, Wood v. United States, 1942, 75 U.S.App.D.C. 274, 128 F.2d 265, 268, 141 A.L.R. 1318, the rule excluding untrustworthy confessions and admissions should be kept separate from the privilege against self-incrimination even though similar considerations are often applicable to these different principles. The privilege historically has been designed to protect persons from questions asked in court or in a quasi-judicial proceeding. The above-quoted language of the Fifth Amendment has been held to apply to quasi-judicial proceedings such as administrative hearings, bankruptcy hearings, preliminary hearings before a commissioner, and hearings before a Congressional committee. See cases collected in Quinn v. United States, Footnote 11, 349 U.S. 155, at page 184, 75 S. Ct. 668, at page 684 and Emspak v. United States, 1955, 349 U.S. 190, 75 S.Ct. 687.

Statements made by a revenue agent, who is a certified public accountant and confident that he has made only minor errors in his tax returns, to an auditing agent in conferences concerning the federal income tax liability of the former, would seem far removed from statements made in a judicial proceeding where the witness may be awed or intimidated into convicting himself by his own testimony. This policy of the law to protect witnesses who are normally unfamiliar with judicial and quasi-judicial proceedings from making statements in the presence of a law enforcing judge or administrator would seem inapplicable in the facts of this case.

The rule adopted by the cases cited by the hearing judge permitting admissions in the nature of confessions to Internal Revenue Agents would seem to rest on the above-mentioned distinction made by Dean Wigmore and Mr. Justice Rutledge and to make the test whether the words or documents were secured by force or deceit so that they were not the freely uttered words of the speaker. For example, the court, in Montgomery v. United States, 5 Cir., 1953, 203 F.2d 887, at page 893, made this statement: "We do not think the circumstances under which the statements of the defendant and of his wife, and the cancelled checks and documents, were obtained were sufficient of themselves to require that that evidence be excluded on the ground of being involuntary as a matter of law, or to require that the Government's Exhibit No. 20 based in part upon such testimony be not admitted in evidence. All of those circumstances were matters which went to the weight or credibility of the testimony thus obtained."

The hearing judge believes the reasoning adopted in the Montgomery case, supra, is supported by the controlling authorities for the reasons indicated above. This would appear to be the view of the Burdick case, supra, since it relies on the Montgomery case and on United States v. Heitner, 2 Cir., 1945, 149 F.2d 105, certiorari denied sub nom. Cryne v. United States, 1945, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432, which concerns admissions and not the privilege against self-incrimination. This reasoning has already been adopted by Judge Clary in this District, United States v. Guerrina, D.C.E.D.Pa.1955, 126 F.Supp. 609, 610–611. Cases such as In re Fried, 2 Cir., 1947, 161 F.2d 453, 1 A.L. R.2d 996, excluding coerced confessions appear to rely on the procedural requirements established for the guidance of Federal judges under the due process clause of the Fifth Amendment, rather than the language of that Amendment concerning compulsory incriminating testimony (see language of the court at page 460 and decisions there cited).

Even if the Constitutional language guaranteeing the privilege against self-incrimination is applicable in this situation (the hearing judge recognizes that several of the cases cited by him apparently base the admissibility of evidence of this type on waiver of the privilege) and if the question of whether waiver by giving testimony to an auditing agent constitutes a waiver for purposes of a criminal proceeding becomes important (see In re Neff, 3 Cir., 1953, 206 F.2d 149, 152, 36 A.L.R.2d 1398), the failure of plaintiff to show any coercion, deceit or misrepresentation in this case and the reasonableness of requiring Form 1361 make the principle adopted in the case of Chieftan Pontiac Co. v. Julian, 1 Cir., 1954, 209 F.2d 657, and cases there cited, particularly applicable. Under that principle, any claim of privilege should be raised at the trial and not at this time.

and voluntarily (see Findings of Fact Nos. 18, 23 and 26).[27]

There is no indication that the Internal Revenue Service contemplated criminal prosecution of plaintiff until after the last January conference.[28] In United States v. Wolrich, D.C.S.D.N.Y. 1954, 119 F.Supp. 538, at page 540, the court said;

"A statement that the purpose of an investigation is a 'routine audit' is not the equivalent of a promise that only civil liability will be considered regardless of what the examination reveals. Nor would any accountant or businessman so understand it."

This point of view is all the more applicable to this plaintiff who was a certified public accountant and fully familiar with the Internal Revenue laws. He admits that he was warned prior to giving the testimony under oath in June 1954, so that there was no violation of his privilege at that time.[29] See Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, 937–938; United States v. Block, 2 Cir., 1937, 88 F.2d 618, 620–621; United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140.

In conclusion, it is clear that the fact that the Government is considering a proceeding under 18 U.S.C.A. § 1001 on the unusual facts of this case should give the great number of Internal Revenue employees who filed Form 1361 no cause for alarm.

### Order

This 5th day of January 1956, it is ordered that the action is dismissed and that judgment is entered for defendants.

27. Since plaintiff has not carried the burden of establishing that his application for retirement was unconnected with the examination of his tax returns, which he admits were incorrect, plaintiff cannot complain that he was forced to give testimony in order to expedite his retirement. There is no evidence that a two-month period (November 15 to January 15) for adjusting errors in a taxpayer's return is an unreasonably long period.

28. This case bears no similarity on its facts to cases such as Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, where a Government agent, under the false pretence of making a social call, took the accused's private papers in his absence and without his consent, and In re Fried, 2 Cir., 1947, 161 F.2d 453, 1 A.L.R.2d 996, writ of certiorari dismissed on motion of United States, 1947, 332 U.S. 807, 68 S.Ct. 105, 92 L.Ed. 384, where statements were secured by third degree methods from accused persons who were kept awake during a night of questioning without food and without access to their lawyers. It is also to be noted that the Treasury Department's policy of waiving tax prosecutions in case of violators who had made voluntary disclosures in order to determine their civil tax liability had been abolished in January 1952 (over a year prior to the period November 15, 1953, to January 15, 1954). See Lipton, Prosecution for Tax Evasion—New Policies and Procedures, 30 Taxes 350 (1952), and Redlick, Searches, Seizures and Self-Incrimination, 10 Tax L.Rev. 191, 208 (1954).

29. By the time that the June 1954 conference took place, the following had taken place:

A. At an early 1954 conference, the Chief of Audit had shouted at plaintiff, "This man is in a tax jam—let him take the consequences." (Finding of Fact 19).

B. At a later meeting in January, plaintiff had received from the Chief of Audit and his Group Chief a letter proposing his suspension.

C. Mr. Tomlinson, whom he knew was Chief of Intelligence which dealt with tax frauds, had come to see him, asked him to come to the conference, and was present at the conference.

D. He was warned that his testimony might be used against him and he was put under oath. (See Finding of Fact 22).

Under such circumstances, it is hard to understand the argument that there is sufficient evidence in this record to convince a court of equity that plaintiff was deceived into believing that only his civil tax liability was under consideration at this June 1954 conference. See, for example, Nicola v. United States, 3 Cir., 1934, 72 F.2d 780, 784, 785.